Betty J. BABCOCK, Appellant–Plaintiff,

v.

LAFAYETTE HOME HOSPITAL, WOMAN'S CLINIC and Jean Carter, M.D., Appellees–Defendants.

No. 79A02–9004–CV–209.

Court of Appeals of Indiana, Second District.

Jan. 22, 1992.

Publication Ordered March 10, 1992.

Lisa V. Schrader, Mathew S. Sandy, Heide Sandy Deets Kennedy Schrader & Antalis, Lafayette, for appellant-plaintiff.

Steven J. Cohen, Edna M. Koch, Tipton Cohen & Koch, Indianapolis, Larry R. Fisher, Susan K. Holtberg, Stuart & Branigin, Lafayette, for Lafayette Home Hosp.

SHIELDS, Judge.

Betty J. Babcock appeals the trial court's grant of summary judgment in favor of Lafayette Home Hospital, Woman's Clinic, and Jean Carter, M.D. (health providers).

We affirm.

### ISSUES

1. Whether the doctrine of continuing wrong renders this action timely.

2. Whether health providers are estopped from asserting the statute of limitations defense due to the doctrine of fraudulent concealment.

3. Whether IC 16–9.5–3–1 violates the equal protection clauses of the United States and Indiana Constitutions.

### FACTS

In March 1986 Babcock was admitted to Lafayette Home Hospital (Hospital) after seeking treatment at the emergency room. Dr. Jean Carter, who was associated with Clinic, performed a hysterectomy on Babcock on March 10, 1986.[1] She performed a second surgical procedure on Babcock the next day due to complications arising from the first operation. Chest x-rays taken on March 12 showed an unexplained pocket of gas or air, known as a "right partial, simple apical pneumothorax." Record at 87. When Babcock was discharged from Hospital on March 17, 1986, Carter told Babcock there would be things she would not be able to eat such as spicy foods, but said that otherwise she would be alright. Carter examined Babcock in Carter's office on April 14, 1986, after which Carter informed Babcock she was recovering well but might continue to experience symptoms of an upset stomach and be unable to eat spicy foods, normal circumstances following a hysterectomy. Carter told Babcock to contact her if she began experiencing problems related to the operations. Babcock did not return to Carter for any further treatment or examination. In July 1986 Carter moved to North Carolina.

Approximately four to five months after the hysterectomy, Babcock began to feel "sick all the time." Supplemental Record at 42. She stated she felt bloated and nauseated and used Pepto–Bismol every day until December of 1988.

In May 1988 Babcock sought treatment for a backache from Dr. Broadar, a chiropractor. Broadar informed Babcock that x-rays revealed an object may have been left in her body cavity from the hysterectomy. Babcock's only response to the information was to sign a release for Broadar to examine her previous health records.

In September 1988 Babcock consulted Dr. Eldon Baker for treatment of "a vaginal gynecological itch." Supplemental Record at 38. On December 13, 1988, she was seen by a Hospital emergency room physician for the same problem. At that time, an x-ray revealed a ribbon-like opacity projected over the upper pelvic region. Babcock was referred to Dr. W. G. Mentzer who removed a sponge from Babcock's pelvis on January 17, 1989.

Babcock filed a proposed complaint with the Indiana Department of Insurance on

---

**1.** Based upon Woman's Clinic's (Clinic) failure to proceed on its burden to establish the lack of a genuine issue of material fact and its entitlement to judgment as a matter of law, we assume the existence of an association between Carter and Clinic as alleged in Babcock's proposed complaint that could result in Clinic's imputed liability.

June 1, 1989, more than three years after the two operations performed by Carter. Hospital, Clinic, and Carter, the named defendants, filed motions for summary judgment which the trial court granted because Babcock had not filed her complaint within the two-year statute of limitations. Babcock appeals.

## DISCUSSION

■■ In reviewing a trial court's ruling on a motion for summary judgment, we apply the same standard as the trial court. Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Smith v. Methodist Hospital of Indiana, Inc.* (1991), Ind. App., 569 N.E.2d 743, 745. We will affirm the grant of summary judgment on any theory sustainable in the record. *Id.*

The relevant statute of limitations provides "[n]o claim ... may be brought against a health care provider based upon professional services or health care rendered or that should have been rendered unless filed within two (2) years from the date of the alleged act, omission, or neglect...." IC 16–9.5–3–1 (1988). Indiana courts have repeatedly described this statute as an "occurrence" statute rather than a "discovery" statute, that is, the two-year period begins to run at the occurrence of the negligence as opposed to the discovery of the negligence. *Ferrell v. Geisler* (1987), Ind.App., 505 N.E.2d 137, 139.

### I.

■ Babcock claims her action is timely under the doctrine of continuing wrong. The doctrine of continuing wrong applies where an entire course of conduct combines to produce an injury. *Cyrus v. Nero* (1989), Ind.App., 546 N.E.2d 328, 331. When certain conduct is determined to constitute a continuing wrong, the statute of limitations does not commence running until the wrongful act ceases. *Havens v. Ritchey* (1991), Ind., 582 N.E.2d 792, 795.

■ Babcock argues "the defendants' failure to remove all foreign objects and leaving a surgical sponge in the plaintiff's body for nearly three (3) years constitutes a continuing wrong. Further, the failure to diagnose this wrong, especially after x-rays demonstrate something foreign remained in plaintiff's body, constitutes a continuing wrong." Appellant's Brief at 16.

The cases applying the doctrine of continuing wrong establish that the conduct that produces the injury must be of a continuing nature, not an isolated event. *See, e.g., Ferrell,* 505 N.E.2d 137 (involving the continuing failure of the physician to diagnose the plaintiff's breast cancer); *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620 (involving the long-term prescription of medications). This case involves only the isolated events of leaving a surgical sponge in Babcock's pelvis and misreading a chest x-ray and is similar to the facts in *Cyrus* in which the court found a failed sterilization operation was an isolated incident and not a continuing wrong. 546 N.E.2d at 331. Thus, in light of existing case law, the trial court correctly determined the alleged malpractice that caused the injury was an isolated event and the doctrine of continuing wrong does not apply.

### II.

Babcock also claims the doctrine of fraudulent concealment estops the health providers from asserting the statute of limitations as a defense.

■ The doctrine of fraudulent concealment estops a defendant from asserting a statute of limitations defense when the defendant has, either by deception or by a violation of a duty, concealed from the plaintiff material facts which prevent the plaintiff from discovering the malpractice. *Cacdac v. Hiland* (1990), Ind., 561 N.E.2d 758, 759; *Hospital Corp. of America v. Hiland* (1989), Ind.App., 547 N.E.2d 869, 873. Thus, equitable estoppel may arise either from active efforts to conceal the malpractice or from a failure to disclose material information when a fiduciary or confidential relationship exists between the physician and the patient. *Id.* Failure of the physician to disclose that which he or

she knows, or in the exercise of reasonable care should have known, satisfies the conduct requirement and constitutes a constructive fraud. *Id.* The constructive fraud terminates, and, accordingly, the basis for the estoppel, when the physician-patient relationship terminates or when a patient learns of the malpractice or discovers information which would lead to the discovery of the malpractice through the exercise of reasonable diligence. *Id.* Fraudulent concealment thus "tolls" the running of the statute of limitations until either the physician-patient relationship ends or the patient discovers the malpractice or learns information which, in the exercise of reasonable diligence, would lead to discovery of the malpractice. *Id.*

■ Babcock asserts the health providers had a duty to disclose that a foreign substance was left in her body cavity as a result of the surgery, and their failure to do so estops health providers from raising the statute of limitations as a defense. Thus, Babcock relies upon that branch of fraudulent concealment arising from the breach of a duty to disclose material information rather than from any active concealment. The trial court's grant of judgment for Carter was correct on two alternative bases.

The physician-patient relationship between Carter and Babcock terminated, at the earliest, in April 1986, and at the latest in July 1986. Babcock's last visit to Carter for medical treatment was on April 14, 1986. Carter moved her practice from Indiana to North Carolina in July 1986. The record is totally devoid of any evidence of a continuing relationship between Babcock and Carter. Babcock's statement in her affidavit that she "considered ... Carter to be her gynecologist and would have contacted her had she had further problems which were gynecological in nature" is insufficient by itself. Record at 77–78. A patient's bare assertion he or she continued to rely upon a physician for medical treatment is insufficient as a matter of law to create a factual issue. *Jones v. Cloyd* (1989), Ind.App., 534 N.E.2d 257, 259. Furthermore, Babcock's actions belie her state-

ment. Babcock consulted Dr. Baker for treatment of "a vaginal gynecological itch." Supplemental Record at 38. Thus, the trial court was correct in determining that, as a matter of law, the relationship between Babcock and Carter terminated no later than July 1986, and that Carter and Clinic were not estopped from asserting the statute of limitations as a defense.

■ Similarly, the relationship between Hospital and Babcock was not one of a continuing nature. The relationship was an isolated event which terminated upon Babcock's discharge from Hospital on March 17, 1986. Thus, any duty Hospital owed Babcock ended on March 17, 1986, and Hospital was not estopped from asserting the statute of limitations defense.

■ Alternatively, the trial court properly granted judgment for the health providers because Babcock did not use due diligence in initiating her action after discovering the alleged malpractice. The doctrine of fraudulent concealment does not provide a plaintiff two full years from the discovery of the alleged malpractice to file his or her claim. *Id.*

> Where grounds exist for estopping a defendant from claiming the statute of limitations as a defense, estoppel will nevertheless be denied if the plaintiff fails to exercise due diligence in filing his claim after the equitable grounds cease to be operational as a valid basis for inducing the plaintiff's delay. A plaintiff should have a reasonable time within which to commence an action after the discovery of the malpractice.

*Ferrell*, 505 N.E.2d at 139. If the period between discovery and the date upon which the statute would ordinarily expire is relatively short, a factual question may be presented as to whether the remaining time was reasonable. *Id.*

In May 1988 Babcock was informed by Dr. Broadar that x-rays revealed an object might have been left in her body cavity from the hysterectomy. At that time Babcock "learn[ed] information which in the exercise of due diligence would lead to the discovery of the malpractice," *Hospital Corp. of America*, 547 N.E.2d at 873, and

yet she did not file her proposed complaint until June 1, 1989, more than one year after learning the information and more than three years after the alleged malpractice. As a matter of law, this delay is not reasonable.

### III.

■ Finally, Babcock claims the trial court's application of IC 16–9.5–3–1 violates the equal protection guarantees of the United States and Indiana Constitutions.[2] Claiming she is "a member of a class of citizens who are barred in pursuing their legal remedies despite the fact that they are unaware of the existence of their cause of action against a professional until after the two (2) year statute of limitations has run," Appellant's Brief at 17, Babcock argues the application of the two-year statute of limitations from the date of occurrence to all citizens is arbitrary and unreasonable because many people have no knowledge of the malpractice until more than two years after the malpractice occurred.

It is questionable whether Babcock belongs to the class of citizens she alleges is harmed by IC 16–9.5–3–1. Babcock's deposition testimony shows she began to experience medical problems four to five months after the hysterectomy. However, for the purpose of Babcock's argument, we assume she is a member of the class.

Courts have repeatedly upheld the constitutionality of IC 16–9.5–3–1 when the statute has been challenged on equal protection grounds. *See Johnson v. St. Vincent Hospital, Inc.*, (1980), 273 Ind. 374, 404 N.E.2d 585 (time limitation and legal disability provisions of IC 16–9.5–3–1 bear a fair and substantial relationship to the legislative purposes of the act and do not violate the equal protection guarantees of the state and federal constitutions); *Rohrabaugh v. Wagoner* (1980), 274 Ind. 661, 413 N.E.2d 891 (reasonable basis exists for legislature to strengthen the statute of limitations in malpractice cases, and children between the ages of six and twenty-one and adults are similarly situated with regard to their ability to bring malpractice claims so as not

to violate equal protection); *Carmichael v. Silbert* (1981), Ind.App., 422 N.E.2d 1330 (IC 16–9.5–3–1 does not violate equal protection merely because it treats medical malpractice victims differently than IC 34–1–2–2 treats general tort victims; such classifications are rationally related to the Medical Malpractice Act purposes and are not arbitrary or unreasonable); *Douglas v. Hugh A. Stallings, M.D., Inc.* (1989), 7th Cir., 870 F.2d 1242, 1248 (Medical Malpractice Act does not violate Equal Protection Clause merely because it treats minor plaintiffs with legal disabilities less favorably than under the general tolling statute by reducing the age of majority to six years and removing the indefinite tolling provision contained in the general statute of limitations for other legal disabilities; limits imposed by IC 16–9.5–3–1 are rationally related to the stated goals of preventing stale claims and controlling the cost of medical care). Statutes of limitations provide a desired order and finality to the litigation process. In addition to addressing the concerns of stale claims and loss of evidence over time that are common to all litigation, IC 16–9.5–3–1 evidences a policy determination that a particular need exists for a shorter than usual period in which malpractice claims must be commenced. IC 16–9.5–3–1 reduces the age of majority to six years, begins the limitations period with the occurrence of the injury rather than its discovery, and abandons the tolling periods for other legal disabilities. *Douglas*, 870 F.2d at 1248.

> Creating a shorter period of limitations in which to commence actions against health care providers is clearly a rational legislative response to the fiscal uncertainties in the health care industry. The ability to commence an action at an indefinite time in the future would no doubt prevent insurance companies from accurately computing the actuarial risk of future claims and compound the escalation of medical costs.

*Douglas*, 870 F.2d at 1248. Although IC 16–9.5–3–1 may provide harsh results in some instances, the distinction it draws

---

**2.** U.S. Const. amend. 14 § 1; Ind. Const. art. 1, § 23.

bears a rational relationship to legitimate state interests supporting the Medical Malpractice Act's statute of limitations and, therefore, survives Babcock's equal protection challenge.

Judgment affirmed.

HOFFMAN and SULLIVAN, JJ., concur.